ACCO

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Southern Division - Santa Ana)
### CIVIL DOCKET FOR CASE #: 8:20-cv-01302

Olver v. Wright Medical Technology Inc
Assigned to:
Cause: 42:1396 - Tort Negligence

Date Filed: 07/20/2020
Jury Demand: None
Nature of Suit: 367 Personal Injury:
Health Care/Pharmaceutical Personal
Injury Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Ann L Olver**

represented by **Raymond Paul Boucher**
Boucher LLP
21600 Oxnard Street Suite 600
Woodland Hills, CA 91367-4903
818-340-5400
Fax: 818-340-5401
Email: ray@boucher.la
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Wright Medical Technology Inc**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/20/2020 | 1 | COMPLAINT Receipt No: ACACDC-27278806 - Fee: $400, filed by Plaintiff Ann L Olver. (Attorney Raymond Paul Boucher added to party Ann L Olver(pty:pla))(Boucher, Raymond) (Entered: 07/20/2020) |
| 07/20/2020 | 2 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff Ann L Olver. (Boucher, Raymond) (Entered: 07/20/2020) |
| 07/20/2020 | 3 | CIVIL COVER SHEET filed by Plaintiff Ann L Olver. (Boucher, Raymond) (Entered: 07/20/2020) |

**PACER Service Center**

**Transaction Receipt**

07/21/2020 06:59:34

| | | | |
|---|---|---|---|
| **PACER Login:** | kirkpope | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 8:20-cv-01302 End date: 7/21/2020 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

1  Raymond P. Boucher, State Bar No. 115364
     *ray@boucher.la*
2  BOUCHER LLP
   21600 Oxnard Street, Suite 600
3  Woodland Hills, California 91367-4903
   Tel:    (818) 340-5400
4  Fax:    (818) 340-5401

5  Attorneys for Plaintiff Ann L. Olver

6

7

8              **UNITED STATES DISTRICT COURT**

9     **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

10

11 ANN L. OLVER,                          Case No.

12          Plaintiff,                    **COMPLAINT FOR DAMAGES**

13      v.                                1. Negligence
                                          2. Strict Products Liability –
14 WRIGHT MEDICAL TECHNOLOGY,                Manufacturing Defect
   INC., a Delaware corporation,          3. Strict Products Liability – Failure to
15                                            Warn
            Defendant.                    4. Negligent Misrepresentation
16                                        5. Fraudulent Concealment
17                                        6. Fraudulent Misrepresentation
                                          7. Punitive Damages
18

19                                        **DEMAND FOR JURY TRIAL**

20

21

22            <u>**COMPLAINT FOR DAMAGES**</u>

23        Plaintiff Ann L. Olver files her Complaint for Damages and Jury Trial

24 Demand against Defendant Wright Medical Technology, Inc., a Delaware

25

26 corporation, respectively showing the Court the following:

27

28

**NATURE OF ACTION**

1.      For many years, Defendant has known their hip replacement device – the Wright Medical Profemur® Total Hip System with Wright Ceramic Femoral Head (the "Head"), Wright Dynasty® PC Shell (the "Cup"), Wright Dynasty® A-Class Poly Liner (the "Liner"), Wright Profemur® Renaissance Stem (the "Stem"), and Profemur® Cobalt Chromium Neck (the "Neck") (collectively referred to as the "Profemur® Total Hip System" or the "Device") – was prone to fail within a few years of implantation despite the fact that hip implant devices typically last more than twenty years.  The Stem of Defendant's Device is comprised of a titanium alloy, while the Neck is comprised of a cobalt chromium alloy.  Defendant has known the Stem-Neck junction of its Device has a tendency to generate fretting and galvanic corrosion in the Neck-Stem body transition, which causes dangerously elevated levels of CoCr, adverse tissue reactions, pseudo tumors and other adverse medical events in patients. As a result of the Device's defects and Defendant's tortious acts/omissions, Plaintiff Ann L. Olver, and many other patients who received these Devices endured unnecessary pain and suffering; debilitating lack of mobility; and a subsequent more difficult revision surgery to replace the defective Device, giving rise to more pain and suffering, a prolonged recovery time, and an increased risk of complications and death from surgery.

**PARTIES**

2.     At all relevant times hereto, Plaintiff Ann L. Olver was and is an adult resident and citizen of the State of California, residing in Lake Forest, Orange County, California.

3.     Defendant Wright Medical Technology, Inc. ("WMT" or "Wright") is a Delaware corporation, with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117, and is registered to do business in the State of California, and at all times relevant hereto did business in the State of Tennessee and in the State of California.  Wright may be served with process by serving its registered agent for service, Corporation Service Company, at 2345 Rice Street, Suite 230, Roseville, California 55113.

4.     Defendant was, at all relevant times, engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, various prosthetic orthopedic products, including the Profemur® Total Hip System at issue in the civil action.

5.     Defendant was involved in the business of designing, licensing, manufacturing, importing, distributing, selling, marketing, and introducing into commerce within the State of California, either directly or indirectly through third parties or related entities, numerous orthopedic products, including the Profemur®

3

COMPLAINT FOR DAMAGES

Total Hip System to include the Neck and Stem, as well as conducting post market surveillance, monitoring and reporting adverse events.

**STATEMENT OF JURISDICTION AND VENUE**

6.　The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different States, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.　Venue is proper in the district pursuant to 28 § 1391, et seq., because a substantial part of the events giving rise to the claim occurred in California and the district.

8.　At all times relevant hereto, throughout the United States, Wright advertised, promoted, marketed, sold and/or distributed the defective PROFEMUR® Total Hip System that included modular necks that were distributed after December 13, 2000, and before August 25, 2009, all of the same being made of a titanium-aluminum-vanadium alloy known as Ti6A14V.

**FACTUAL ALLEGATIONS**

9.　Profemur® modular necks were first patented and marketed by Cremascoli Ortho ("Cremascoli"), a European medical device manufacturer in 1986.

10.　In December 1999, Wright acquired Cremascoli, its product lines, documents, and manufacturing facilities, including the Profemur® line of hip products.

11.   After the acquisition of Cremascoli, Wright re-designed the Profemur® modular artificial hip stem and modular neck, expanded the product line to include additional titanium models or versions of Profemur® stems and Profemur® modular necks, and rebranded the Cremascoli titanium modular neck product line, and compatible titanium artificial hip stems, as the Wright Profemur® Total Hip System.

12.   By the way of what is known as the Section 510(k) premarket notification process, on December 13, 2000, Wright received permission from the U.S. Food and Drug Administration (FDA) to distribute in the United States its first titanium modular neck and stem artificial hips.

13.   The FDA never considered or approved the safety of Wright's newly rebranded hip implant system and product line of titanium modular necks, but instead concluded only that Wright's hip implant system was substantially equivalent to an already legally marketed device (i.e., the Cremascoli modular neck component acquired by Wright in December 1999).

14.   Sometime after December 13, 2000, Wright began to manufacture, label, market, promote, distribute and sell in the United States the hip implant devices branded as "Profemur® Total Hip System," which included titanium stems and titanium modular necks.

15.   The Wright Medical Profemur® modular necks that were distributed by Wright after December 13, 2000, and before August 25, 2009, were all made of the titanium-aluminum-vanadium alloy known as Ti6A14V.

COMPLAINT FOR DAMAGES

16.    In the year 2000 and in all years thereafter to the present, Ti6A14V was an alloy generally available for use in manufacturing implantable medical devices.

17.    In the year 2000 and in all years thereafter to the present, monoblock hip implant stems without modular neck-stem junctions were generally available for use in manufacturing artificial hip implants.

18.    In various marketing and promotional material published and distributed by Wright from approximately the year 2002, and into the year 2005, and available to Wright's sales representatives and distributors, surgeons, patients and the general public, Wright made the following representations, statements, claims and guarantees about its Profemur® modular necks:

> The modular neck used with the Profemur® hip has been employed by Wright Cremascoli for over fifteen years.  The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures.  The necks are used in other Wright Cremascoli hip systems besides the Profemur® hip.  <u>None of the necks has experienced a clinical failure since their inception</u> [emphasis added].

and

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent No. 4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty. Extensive laboratory tests have proven that the coupling between the

modular neck and femoral implant <u>guarantees</u>:

- Structural reliability
- <u>Absence of significant micromovement</u>
- <u>Absence of fretting corrosion</u>

[emphasis added].

[Wright Medical Technology Monograph MH688-102© 2004].

19.     On or about April 19, 2005, Wright first reported to the FDA a Profemur® modular neck clinical failure where a Ti6A14V modular neck implanted in a patient experienced a catastrophic fracture (i.e., breaking into two pieces) at the oblong tapered distal end where the neck is seated in the stem.

20.     After receiving notice of the first modular neck fracture, Wright received notice of additional modular neck clinical failures in the form of fractures of the modular necks.

21.     The number of Profemur® Ti6A14V modular neck clinical fractures in the form of fractures of the modular neck has continued to increase over time, and continues to increase to the present day, now numbering more than 400 such clinical failures.

22.     As the number of reported Wright Ti6A14V modular neck fractures continued to increase, case studies appeared in medical journals reporting the fracture of Wright titanium Profemur® modular necks and identifying micromotion and fretting corrosion at the neck-stem junction as the cause and mode of failure.

COMPLAINT FOR DAMAGES

23.    At some point in time prior to August 25, 2009, Wright had notice that a higher than normal rate of early failure of its Profemur® line of hip implant devices were failing by fracture at the modular neck junction secondary to micromotion, fretting and corrosion.

24.    As the number of reported Wright Ti6A14V Profemur® modular neck fractures continued to increase, Wright, rather than redesigning its hip implant system to eliminate the modular neck-stem junction and thereby eliminate micromotion and fretting corrosion, instead began to design and develop a Profemur® modular neck made of a cobalt chrome (CoCr) metal alloy.

25.    On April 16, 2009, Wright submitted a Section 510(k) premarket notification of intent to market a device generally identified as Profemur® hip system modular necks made of a cobalt chrome alloy to the FDA.

26.    On or about August 25, 2009, Wright began to market and offer for distribution and sale in the United States Profemur® modular Necks made of cobalt chromium alloy, and Wright simultaneously began withdrawing from the market its Profemur® modular necks comprised of Ti6A14V titanium alloy.

27.    Rather than swapping its titanium modular necks, which were known to fracture secondary to micromotion and fretting corrosion, for more durable cobalt chromium ("CoCr") modular necks, Wright could have eliminated the potential for fretting and corrosion at the modular neck junction of its Profemur® hip implants by abandoning modularity and manufacturing, designing, and marketing monoblock

8

stems, but it chose not to do so because Wright did not want to lose its investment in the market share for the use of modular stems in primary hip implant arthroplasties.

28.     In promoting its Profemur® CoCr modular Necks Wright claimed that the cobalt chrome modular Necks would result in less fretting than occurred with Ti6A14V modular necks.

29.     The design of the Profemur® CoCr modular Neck, when coupled with the design of the titanium Profemur® hip Stems, is such that it in fact promotes the process of fretting corrosion at the modular Neck-Stem junction.

30.     In promoting its Profemur® CoCr modular Necks, Wright claimed that the use of dissimilar metals, such as mating a CoCr modular Neck with a titanium Stem, would not result in galvanic corrosion (a corrosion process not unlike what takes place with a car battery) at a level that would be problematic for patients.

31.     Wright's claims that mating a CoCr modular Neck with a titanium Stem would not result in galvanic corrosion at a level that would be problematic for patients, were not supported by unbiased, sound scientific testing.

32.     Claims by Wright that mating Profemur® CoCr modular Necks with Profemur® titanium Stems would not result in galvanic corrosion at a level that would be problematic for patients were false and/or misleading.

33.     The Profemur® CoCr modular Necks that Wright designed and manufactured were designed to be used with most, if not all, of the same femoral

COMPLAINT FOR DAMAGES

heads and most, if not all, of the same Profemur® titanium hip Stems as were its titanium (Ti6A14V) Profemur® modular necks.

34. While promoting its Profemur® CoCr modular Necks Wright Medical stated, "[p]roduct complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® CoCr modular Necks." [See Profemur® CoCr Modular Necks Frequently Asked Questions, Wright Medical publication MH 1619-812.]

35. Wright's statement in its promotion materials that "[p]roduct complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® CoCr modular Necks," was not supported by unbiased sound scientific testing.

36. The claim by Wright that "[p]roduct complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® CoCr modular Necks" was false and/or misleading.

37. While promoting its Profemur® CoCr modular Necks, Wright claimed that its CoCr modular Necks would result in less fretting than occurred with titanium modular necks.

COMPLAINT FOR DAMAGES

38.   Claims by Wright that its CoCr modular Necks would result in less fretting than occurred with titanium (Ti6A14V) modular necks were not supported by unbiased, sound scientific testing.

39.   Claims by Wright that its CoCr modular Necks would result in less fretting than occurred with titanium (Ti6A14V) modular necks were false and/or misleading.

40.   The design of the Profemur® CoCr modular Neck, when coupled with the design of the titanium (Ti6A14V) Profemur® hip Stems, is such that it in fact encourages the process of fretting corrosion at the modular Neck-Stem junction.

41.   In promoting its Profemur® CoCr modular Necks, Wright claimed that the use of dissimilar metals, such as mating a CoCr modular Neck with a titanium Stem, would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients.

42.   Claims by Wright that mating a CoCr modular Neck with a titanium Stem would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients, were not supported by unbiased, sound scientific testing.

43.   The design of the Profemur® CoCr modular Neck, when coupled with the design of the titanium Profemur® hip Stems is such that it in fact promotes the process of galvanic corrosion at the modular Neck-Stem junction.

44.   Prior to offering its Profemur® CoCr modular Necks for distribution or sale in the United States, Wright did not adequately test its design of CoCr Profemur®

modular Necks for fretting corrosion or the biological effect of corrosion on the body after implantation in patients.

45.     Prior to offering its Profemur® CoCr modular Necks for distribution or sale in the United States, Wright did not adequately test its design of CoCr Profemur® modular Necks for galvanic corrosion or the biological effect of corrosion on the body after implantation in patients.

46.     Prior to offering their Profemur® CoCr modular Necks for distribution or sale in the United States, Wright did not adequately test its design of CoCr Profemur® modular Necks for galvanic corrosion when mated with titanium Profemur® hip Stems after implantation.

47.     Wright rushed the Profemur® CoCr modular Necks to market without adequately testing it for in vivo performance, including, but not limited to, resistance to fretting and galvanic corrosion or the effects of corrosion on human tissue.

48.     Wright rushed the Profemur® CoCr modular Necks to market in order to preserve market share and its profits from the sale of its failing Profemur® hip implant products.

49.     Prior to August 24, 2011 and April 4, 2012, Wright had been informed that its Profemur® CoCr modular Necks were corroding in patients to the extent that revision surgeries were necessary to remove the Profemur® CoCr modular Necks.

50.     Wright knew or should have known that as of August 24, 2011, the date Plaintiff Ann L. Olver received her left Wright Profemur® Total Hip System and as of

April 4, 2012, the date Plaintiff Ann L. Olver received her right Wright Profemur®

Total Hip System:

(a)    Wright had not adequately tested the Profemur® CoCr

modular Necks to simulate in vivo performance for resistance to

fretting corrosion;

(b)    Wright had not adequately tested the Profemur® CoCr

modular Necks to simulate in vivo performance for resistance to

galvanic corrosion;

(c)    Wright's Profemur® CoCr modular Necks would be

subject to fretting corrosion;

(d)    there was an increased risk of fretting corrosion at the

Neck-Stem junction;

(e)    there was an increased risk of galvanic corrosion at the

Neck-Stem junction; and

(f)    there was a substantial risk that patients' bodies would be

adversely affected by the exposure to corrosion, metal debris and metal

ions secondary to corrosion.

51.    The Neck-Stem junctions of the Profemur® CoCr modular Neck, coupled

with a Profemur® titanium hip stem, are subject to significant movement which results

in fretting corrosion, galvanic corrosion, and metal ion release.

52.     Product complaint data reported to Wright prior to August 24, 2011 and April 4, 2012 indicated an increased risk of adverse events due to taper junction fretting and corrosion for Profemur® CoCr modular Necks when coupled with Profemur® titanium hip Stems, as compared to traditional titanium necks.

53.     Product complaint data reported to Wright prior to August 24, 2011 and April 4, 2012 indicated an increased risk of adverse events due to galvanic corrosion, as compared to traditional titanium necks when coupled with Wright Medical Profemur® hip stems.

54.     Based upon what Wright knew or should have known before August 24, 2011 and April 4, 2012, Wright should have informed orthopedic surgeons using its Profemur® Total Hip Systems that there was an increased risk of fretting and galvanic corrosion for Profemur® CoCr modular Necks when coupled with Profemur® titanium hip stems.

55.     The Profemur® CoCr modular Neck, Profemur® titanium modular Stem and the Profemur® Total Hip System are defective in design in that the risks inherent in the product's use for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing the defective products in the body of Plaintiff Ann L. Olver.

56.     Additionally, the Profemur® CoCr modular Neck, Profemur® titanium modular Stem and the Profemur® Total Hip Systems implanted in Plaintiff Ann L. Olver were defective in manufacture, as Wright manufactured same such that the

tolerances between the Stem and Neck components did not comply with Wright's design specifications.

57.   Based upon the facts and allegations set forth above, the Profemur® CoCr modular Neck, Profemur® titanium Stem, and the Profemur® Total Hip System are defective in labeling in that they do not perform as represented, and the risks that were inherent in the product being used for hip replacement, when weighed against the utility or benefit derived from the product's use, outweigh any alleged benefit.

58.   Based upon the facts and allegations set forth above, the Wright Medical Profemur® CoCr modular Necks, Profemur® titanium modular Stem, and the Profemur® hip system are unreasonably dangerous in that the risks that were inherent in the product being used for hip replacement, when weighed against the alleged utility or benefit derived from the product's use, outweigh the benefit.

59.   Defendant was negligent in design, manufacture, distribution, sale, marketing, promotion, and labeling of the Profemur® CoCr modular Neck, Profemur® titanium modular Stem, and the Profemur® Total Hip System.

60.   Defendant was negligent in the failure to warn patients and/or surgeons that they had received product complaint data that indicated an increased risk of adverse events due to taper junction fretting and corrosion, as compared to other available safe alternative devices.

61.   Defendant was negligent in failing to warn patients and surgeons that they had received product complaint data that indicated an increased risk of adverse

events due to galvanic corrosion, as compared to other available safe alternative devices.

### PLAINTIFF ANN L. OLVER'S PROFEMUR® HIP

62.     On or about August 24, 2011, Plaintiff Ann L. Olver had a Wright artificial hip implanted in her left hip ("Left Index Surgery") in a procedure known as a total hip arthroplasty (or "THA").

63.     Orthopedic surgeon R. Lance Montgomery, M.D. ("Dr. Montgomery") performed the Left Index Surgery during which he implanted a Profemur® Total Hip System in Plaintiff Ann L. Olver.

64.     Plaintiff Ann L. Olver's Left Index Surgery was performed at Saddleback Memorial Medical Center, 24451 Health Center, Shakopee, California 55379.

65.     Dr. Montgomery, did not breach any generally accepted standard of care in the field of orthopedic surgery in her care and treatment of Plaintiff Ann L. Olver or negligently cause any injury to Plaintiff regarding the Left Index Surgery in any of the following respects:

(a)     in the care or treatment that he provided to Plaintiff Ann L. Olver prior to beginning the Left Index Surgery;

(b)     in the Left Index Surgery he performed on Plaintiff Ann L. Olver; or

(c)     in the care or treatment that he provided to Plaintiff Ann L.

1    Olver, subsequent to Plaintiff Ann L. Olver's Left Index Surgery.

2    66.    Based upon the patient population that Wright intended its artificial hip

3    devices to be implanted in, at the time of Plaintiff Ann L. Olver's Left Index Surgery,

4    

5    he was an appropriate patient to be implanted with the Profemur® Total Hip System.

6    67.    On or about April 4, 2012, Plaintiff Ann L. Olver had a Wright artificial

7    

8    hip implanted in her right hip ("Right Index Surgery") in a procedure known as a total

9    hip arthroplasty (or "THA").

10    68.    Orthopedic surgeon R. Lance Montgomery, M.D. ("Dr. Montgomery")

11    

12    performed the Right Index Surgery during which he implanted a Profemur® Total Hip

13    System in Plaintiff Ann L. Olver.

14    69.    Plaintiff Ann L. Olver's Right Index Surgery was performed at

15    

16    Saddleback Memorial Medical Center, 24451 Health Center, Shakopee, California

17    55379.

18    70.    Dr. Montgomery, did not breach any generally accepted standard of care

19    

20    in the field of orthopedic surgery in her care and treatment of Plaintiff Ann L. Olver

21    or negligently cause any injury to Plaintiff regarding the Right Index Surgery in any

22    of the following respects:

23    

24    (a)    in the care or treatment that he provided to Plaintiff Ann L. Olver

25    prior to beginning the Right Index Surgery;

26    (b)    in the Right Index Surgery he performed on Plaintiff Ann L.

27    

28    Olver; or

17

COMPLAINT FOR DAMAGES

(c)     in the care or treatment that he provided to Plaintiff Ann L. Olver, subsequent to Plaintiff Ann L. Olver's Right Index Surgery.

71.     Based upon the patient population that Wright intended its artificial hip devices to be implanted in, at the time of Plaintiff Ann L. Olver's Right Index Surgery, he was an appropriate patient to be implanted with the Profemur® Total Hip System.

72.     Dr. Montgomery recommended the Profemur® Total Hip Systems to Plaintiff Ann L. Olver and indicated that the Devices were appropriate for her.

73.     Plaintiff Ann L. Olver reasonably relied upon Dr. Montgomery in deciding to proceed with hip replacement surgeries and have the Profemur® Total Hip Systems implanted.

74.     Before or during the course of Plaintiff Ann L. Olver's Left Index Surgery and Right Index Surgery, Defendant arranged for the Profemur® Total Hip Systems that were implanted in Plaintiff Ann L. Olver to be delivered to Saddleback Memorial Medical Center and/or Dr. Montgomery for implantation in Plaintiff Ann L. Olver.

75.     Defendant, directly or through its subsidiaries or affiliates, designed, manufactured, distributed and sold in the United States various prosthetic orthopedic devices, including the Profemur® Total Hip Systems implanted in Plaintiff Ann L. Olver during the Left Index Surgery and Right Index Surgery, which included the following components:

Left Index Surgery

COMPLAINT FOR DAMAGES

- Wright Medical Technology Acetabular Shell Plus
  Size 42 x 48 mm
  Ref: 3802-4248
  Lot: 0601131795

- Profemur Plus CoCr Modular Neck Long/A/R/Var 2
  Size 42 mm, Group G
  Ref: PHAC-1214
  Lot: 2018-01

- Wright Conserve Total A-Class Head w/BFH Tech Medium Neck
  Ref: 38AM-4200
  Lot: 019779432

- Wright Profemur® Plus CoCr Modular Neck
  Long A/R Var/Val 1
  Ref: PHAC-1214
  Lot: 010103980810

- Wright Medical Technology Femoral Stem
  Size 3
  Ref: PHA-00236
  Lot: 0611375622

Right Index Surgery

- Wright Dynasty® Biofoam Shell
  Size 50 mm, Group C
  Ref: DSBF-GC50
  Lot: 1422372

- Wright Dynasty® A-Class Poly Liner
  Size 32 mm, Group C
  Ref: DLXP-GC32
  Lot: 0711382297

- Wright Lineage/Transcend Femoral Head
  Size 32 mm + 0 mm Neck Length
  Ref: 2600-0022
  Lot: 1101253677

19

- Wright Profemur® Plus CoCr Modular Neck
  Short A/R Var/Val 1
  Ref:  PHAC-1222
  Lot:  0311316435

- Wright Profemur® Z Femoral Stem
  Size 3; 118 mm length
  Ref:  PHAO-0236
  Lot:  1409310

- Wright Apical Hole Plug with Hex Handle
  Ref:  3118-0002
  Lot:  1001235045

- Cancellous Self-Tapping Bone Screw
  Ref:  PHAO-0236
  Lot:  1409310

These Wright components are hereinafter, as in prior paragraphs, collectively referred to as the "Profemur® Total Hip System" or the "Device".

76.    At the Left Index Surgery and the Right Index Surgery, each of the components of Plaintiff Ann L. Olver's Profemur® Total Hip System was in substantially the same condition in all relevant respects as when they left Defendant's control.

77.    At all times relevant hereto, Plaintiff Ann L. Olver used the Profemur® Total Hip Systems implanted during the Left Index Surgery and the Right Index Surgery in a normal and reasonably foreseeable manner.

78.    On or about May 2, 2019, Plaintiff Ann L. Olver reported to Dr. Abraham D. Kim, M.D. ("Dr. Kim") for revision surgery of her left failed hip prosthesis ("Left Revision Surgery").   Dr. Kim recommended the Left Revision

COMPLAINT FOR DAMAGES

Surgery after Plaintiff Ann L. Olver presented with pain, alteration in gait, and persistent elevated cobalt ion levels and pain.

79. Plaintiff Ann L. Olver's Left Revision Surgery was necessary because the Device failed due to corrosion at the Neck-Stem junction of the Device.

80. The Left Revision Surgery was performed by Dr. Kim at Saddleback Memorial Medical Center, 24451 Health Center, Laguna Hills, California 92653. During the Left Revision Surgery, Dr. Kim removed failed components of the Profemur® Total Hip System Plaintiff Ann L. Olver received during the Left Index Surgery.

81. But for the fact that the CoCr modular Neck of the Device Plaintiff Ann L. Olver had received during the Left Index Surgery had corroded causing it to fail and injure Plaintiff Ann L. Olver, Plaintiff Ann L. Olver's Device was not otherwise in need of revision.

82. The Device implanted during the Left Revision Surgery failed due to corrosion of the oblong taper of the Profemur® CoCr modular Neck where it seated in the pocket of the Profemur® titanium Stem, which caused continuing and otherwise irreversible physical injury to Plaintiff Ann L. Olver.

83. The Profemur® Total Hip System implanted in Plaintiff Ann L. Olver's left hip failed as a direct and proximate result of the actions, conduct, negligence, and breach of duties of the Defendant, as alleged in the Complaint.

COMPLAINT FOR DAMAGES

84. The Profemur® Total Hip System (and its components), to include the Device implanted in Plaintiff Ann L. Olver during the Left Revision Surgery was not merchantable, but was unreasonably dangerous for its intended and/or reasonably foreseeable uses in that:

(a) it was and is unreasonably dangerous under California's product liability law as a result of one or more or a combination of the following:

(i) the Neck was manufactured/designed in such a manner as to be subjected to excessive micromotion and fretting corrosion, thereby increasing the potential for failure;

(ii) the Neck was manufactured/designed in such a manner as to be subjected to excessive micromotion and galvanic corrosion, thereby increasing the potential for failure;

(iii) the surface of the section of the Neck that was inserted into the modular Stem was manufactured/designed in such a manner as to increase the potential for fretting and galvanic corrosion, thereby increasing the potential for failure;

(iv) the portion of the Neck that was inserted into the modular Stem was in a narrow, confined space, thereby increasing the potential for fretting, corrosion and failure;

(v) the components were manufactured/designed in such a way as to make the modular Neck component susceptible to

micromotion, fretting and galvanic corrosion, thereby increasing the
potential for failure;

(vi)    the components were manufactured/designed in such a
way as to cause dissimilar metals (i.e., a CoCr modular Neck and
titanium modular Stem) to mate by insertion into a narrow, confined
space, thereby increasing the potential for galvanic corrosion; and

(vii)   there may be other conditions or defects yet to be
determined.

(b)     it was dangerous to an extent beyond which could be
contemplated by the ordinary consumer with the ordinary knowledge
common to the community as to its characteristics in that:

(i)     the ordinary consumer would not contemplate that the
Device would become so corroded that revision surgery would become
necessary prematurely; and

(ii)    the ordinary consumer would not contemplate that the
ordinary activities of daily living would result in the Device releasing
harmful metal ions in the consumer's body that caused adverse tissue
reactions and other medical complications.

85.     The Device was not tested in design and development under conditions
that were known would be encountered in the normal in vivo patient environment
over substantial periods of time.

86. The Device was not tested in design and development under the normal in vivo patient environment conditions that were known would be encountered during normal use of the Device.

87. The Device was not tested for the FDA Section 510(k) Premarket Notification Process under conditions that were known would be encountered in the normal in vivo patient environment.

88. The Device was known by Defendant to be failing from fretting and galvanic corrosion of the modular Neck-Stem junction prior to the day of its FDA 510(k) Premarket Notification Application.

89. The Device was known by Defendant to be failing at higher than expected rates from micromotion, fretting, corrosion, and galvanic corrosion of the modular Neck-Stem junction prior to the date of its implantation in Plaintiff Ann L. Olver during the Left Index Surgery.

90. The Device was known by Defendant to be failing at higher than expected rates due to fretting and galvanic corrosion prior to the date of Plaintiff Ann L. Olver's Left Revision Surgery, during which the Device was discovered to be corroded at the Neck-Stem junction.

91. Prior to the Left Index Surgery, Wright did not warn patients, surgeons, customers, or its sales representatives/distributors that the Device was known to be failing from corrosion at higher than expected rates.

COMPLAINT FOR DAMAGES

92.    The Device implanted in Plaintiff Ann L. Olver's left side failed due to corrosion as a result of one or more or a combination of the foregoing unreasonably dangerous conditions.

93.    As a direct and proximate result of the failure of the Profemur® Total Hip System, Plaintiff Ann L. Olver received during the Left Index Surgery Plaintiff Ann L. Olver has sustained injuries and damages, including, but not limited to:

(a)    undergoing surgery to remove and replace the failed left prosthesis;

(b)    past and future pain and anguish, both in mind and in body;

(c)    permanent diminishment of her ability to participate in and enjoy the affairs of life;

(d)    medical bills associated with the revision surgery and recovery therefrom;

(e)    future medical expenses;

(f)    loss of enjoyment of life;

(g)    loss of past and future earnings and earning capacity;

(h)    disfigurement; and

(i)    physical impairment.

## FEDERAL STATUTORY AND REGULATORY REQUIREMENTS

94.    Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the

methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements.  21 U.S.C. § 351.

95.     Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof.  21 U.S.C. § 352.

96.     Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices.  In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury.  Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health.  21 U.S.C. § 360(i).

97.     Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device, but not including an evaluation of the

safety or effectiveness of a device), packaging, storage and installation of a device conform to current good manufacturing practice, as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law.

98.     The regulations requiring conformance to good manufacturing practices are set forth in 21 C.F.R. § 820, *et seq.*  As explained in the Federal Register, because the Current Good Manufacturing Practice (CGMP) regulations must apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device.  Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured and the manufacturing processes employed.  Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

99.     Pursuant to 21 C.F.R. § 820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Drug & Cosmetic Act ("the Act").  21 U.S.C. § 351.

100.     Pursuant to 21 C.F.R. § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured.     "Quality system" means the organizational structure,

responsibilities, procedures, processes and resources for implementing quality management. 21 C.F.R. § 820.3(v).

101. Pursuant to 21 C.F.R. § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

102. Pursuant to 21 C.F.R. § 820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

103. Pursuant to 21 C.F.R. § 820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

104. Pursuant to 21 C.F.R. § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

105. Pursuant to 21 C.F.R. § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

106. Pursuant to 21 C.F.R. § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design. Design validation shall be performed under defined operating conditions on initial production units, lots or

COMPLAINT FOR DAMAGES

batches, or their equivalents. Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

107. Pursuant to 21 C.F.R. § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

108. Pursuant to 21 C.F.R. § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review and approval of design changes before their implementation.

109. Pursuant to 21 C.F.R. § 820.70(a), each manufacturer shall develop, conduct, control and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications. Such process controls shall include:

(a) documented instructions, standard operating procedures (SOPs) and methods that define and control the manner of production;

(b) monitoring and control of process parameters and component and device characteristics during production;

(c) compliance with specified reference standards or codes;

(d)    the approval of processes and process equipment; and

(e)    criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples.

110.    Pursuant to 21 C.F.R. § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process or procedure.

111.    Pursuant to 21 C.F.R. § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

112.    Pursuant to 21 C.F.R. § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on produce quality.

113.    Pursuant to 21 C.F.R. § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed and installed to facilitate maintenance, adjustment, cleaning and use.

114.    Pursuant to 21 C.F.R. § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could

COMPLAINT FOR DAMAGES

reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

115. Pursuant to 21 C.F.R. § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate computer software for its intended use according to an established protocol.

116. Pursuant to 21 C.F.R. § 820.72, each manufacturer shall ensure that all inspection, measuring and test equipment, including mechanical, automated or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results. Each manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked and maintained.

117. Pursuant to 21 C.F.R. § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures. "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. *See* 21 C.F.R. § 820.3(z)(1).

118. Pursuant to 21 C.F.R. § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each

manufacturer shall ensure that validated processes are performed by qualified individuals.

119.   Pursuant to 21 C.F.R. § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

120.   Pursuant to 21 C.F.R. § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action.   The procedures shall include requirements for:

(a)   analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product or other quality problems;

(b)   investigating the cause of nonconformities relating to product, processes and the quality system;

(c)   identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(d)   verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

(e)   implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(f)    ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

(g)    submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

121.   Upon information and belief, Wright's Profemur® Total Hip System is adulterated pursuant to 21 U.S.C. § 351 because, among other things, it failed to meet established performance standards and/or the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

122.   Upon information and belief, Wright's Profemur® Total Hip System is misbranded because, among other things, it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

123.   Upon information and belief, Wright's Profemur® Total Hip System is adulterated pursuant to 21 U.S.C. § 351 because Wright failed to establish and maintain CGMP for its Profemur® Total Hip System, including components, in accordance with 21 C.F.R. § 820, *et seq.*, as set forth above.

124.   Upon information and belief, Wright failed to establish and maintain CGMP with respect to the quality audits, quality testing and process validation for its Profemur® Total Hip System, including its components.

125.   As a result of Wright's failure to establish and maintain CGMP as set forth above, Wright's Profemur® Total Hip System was defective and failed, resulting in injuries to Plaintiff Ann L. Olver.

126.   If Wright had complied with the federal requirements regarding CGMP, Wright's Medical Profemur® Total Hip System would have been manufactured and/or designed properly such that it would not have resulted in injuries to Plaintiff Ann L. Olver.

127.   Plaintiff Ann L. Olver's injuries were both factually and proximately caused by the Defendant's defective Profemur® Total Hip System.

128.   Plaintiff Ann L. Olver's injuries were both factually and proximately caused by the Defendant's unreasonably dangerous Profemur® Total Hip System.

129.   Plaintiff Ann L. Olver further shows that she is entitled to recover for all noneconomic and compensatory damages allowed by law, including, but not limited to, pain and suffering for all pain and suffering that he has incurred as a result of the defective product, the follow-up surgery, rehabilitation, and constant pain that occurs as a result of the failure of the Device.

## LIABILITY

## COUNT 1 – NEGLIGENT DESIGN AND FAILURE TO WARN OR INSTRUCT

130.   Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs 1-129 of this Complaint.

131.   Defendant owed a duty of reasonable care to the general public, including Plaintiff when it designed, manufactured, assembled, inspected, tested, marketed, placed into the stream of commerce, and sold the Wright Medical Profemur® CoCr Modular Neck, the Wright Medical Profemur® titanium modular stem and the Wright Medical Profemur® Total Hip System, to protect users from an unreasonable risk of harm when using the device for its intended purpose, in a reasonably foreseeable manner.

132.   Defendant breached this duty by designing, manufacturing, assembling, inspecting, testing, marketing, distributing and selling the Wright Medical Profemur® CoCr Modular Neck, the Wright Medical Profemur® titanium modular stem and the Wright Medical Profemur® Total Hip System in a defective and unreasonably unsafe condition including, but not limited to, its foreseeably appreciated risk of harm from the device's propensity for fretting, corrosion and failure. A reasonably careful medical device manufacturer would not have acted in this manner.

133.   Likewise, Defendant owed Plaintiff a duty of reasonable care to discover the defects and to inform and/or warn her or her implanting surgeon of the defects once they were discovered, and Defendant failed to warn of the dangers inherent in the reasonably foreseeable use of the Wright Medical Profemur® Total Hip System, further placing Plaintiff at risk for harm and injury.  Also, Defendant owed Plaintiff and/or Plaintiff's surgeon a continued duty to warn of risks associated

with its Wright Medical Profemur® Total Hip System to limit the damages that Plaintiffs sustained.

134.   Defendant was negligent in the particulars set forth in this Complaint, and such negligence was a direct and proximate cause of the incident and injuries set forth herein.

## COUNT 2 – STRICT PRODUCTS LIABILITY: MANUFACTURING DEFECT

135.   Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs 1-129 of this Complaint.

136.   Plaintiff was damaged by the defective Wright Medical Profemur® CoCr Modular Neck, the Wright Medical Profemur® titanium modular stem, and the overall Wright Medical Profemur® Total Hip System, including by having to undergo revision surgery 8 years post-implant.

137.   Prior to, on, and after the dates of Plaintiff's initial hip surgery, and at all times relevant to this action, Wright was engaged in the business of manufacturing, selling and distributing the Wright Medical Profemur® CoCr Modular Neck, the Wright Medical Profemur® titanium modular stem, and the overall Wright Medical Profemur® Total Hip System.

138.   The Wright Medical Profemur® Total Hip System used in Plaintiff's left hip replacement index surgery was supplied in a defective condition in its manufacture, such that because the tolerances between the stem and neck

components did not comply with Wright's design specifications it would experience motion, fretting and corrosion at the stem-neck junction, rendering it unreasonably dangerous.

139.   Plaintiff's physicians employed the Wright Medical Profemur® Total Hip System in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Defendant.

140.   Defendant failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were feasible and marketable and, in fact, were being sold and marketed by Defendant at the time Defendant sold the Wright Medical Profemur® Total Hip System to Plaintiff.

141.   The Wright Medical Profemur® Total Hip System's defective condition proximately caused Plaintiffs' damages.

## COUNT 3 – STRICT PRODUCTS LIABILITY – FAILURE TO WARN

142.   Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs 1-129 of this Complaint.

143.   Plaintiff was damaged by the defective Profemur® CoCr modular Neck, the Profemur® titanium modular Stem, and the Profemur® Total Hip System.

144.   Wright was engaged in the business of manufacturing, selling and distributing the Profemur® CoCr modular Neck, the Profemur® titanium modular Stem, and the Profemur® Total Hip System.

145.   At all times relevant herein, Defendant was engaged in the design, development, testing, manufacturing, marketing, and sale of the Profemur® Total Hip System devices.

146.   Defendant designed, manufactured, assembled, and sold the Profemur® Total Hip System devices to medical professionals and patients knowing that they would then be implanted in patients in need of a hip prosthesis.

147.   Defendant distributed and sold the Profemur® Total Hip System devices in a condition such that when they left its place of manufacture, in their original form of manufacture, they included the defects described herein.

148.   The Profemur® Total Hip System devices were expected to and did reach Plaintiff and her implanting surgeon without substantial change or adjustment in their condition as manufactured and sold by Defendant.

149.   Defendant's Profemur® Total Hip System device designed, developed, tested, manufactured, marketed and sold or otherwise placed into the stream of commerce by Defendant were in a dangerous and defective condition and posed a threat to any user or consumer of the Profemur® Total Hip System device.

150.   At all times relevant herein, Plaintiff was a person whom Defendant should have considered to be subject to the harm caused by the defective nature of the Profemur® Total Hip System device.

151.   Defendant's Device was implanted and used in the manner for which it was intended.

152.   This use has resulted in severe physical and emotional and other injuries to Plaintiff.

153.   Defendant knew or should have known through testing, adverse event reporting or otherwise that its Profemur® Total Hip System device created a high risk of bodily injury and serious harm.

154.   Defendant had a duty to warn its sales representatives/distributors, implanting surgeons and patients such as Plaintiff, and Defendant breached its duty in failing to provide adequate and timely warnings or instructions regarding their Profemur® Total Hip System devices and their known defects.

155.   Defendant, furthermore, breached its duty to warn at pre-surgery and/or post-surgery by (a) failing to adequately communicate the warning to Defendant's sales representatives/distributors and/or to the ultimate users, i.e., Plaintiff and/or her implanting physician; and/or (b) by failing to provide an adequate warning of the Device's potential risks.

156.   Adequate efforts to communicate a warning to the ultimate users were not made by Defendant (or Defendant's sales representatives/distributors) and, to the extent a warning was communicated by Defendant, the warning was inadequate.

157.   The warnings (pre-surgery and/or post-surgery) to Plaintiff and her implanting physician about the dangers the Device posed to consumers were inadequate.  Examples of the lack and/or inadequacy of Defendant's warnings include, but are not limited to, one or more of the following particulars:

(a)    the Device contained warnings insufficient to alert Plaintiff and Plaintiff's physicians as to the unreasonably high failure rate and propensity for corrosion, associated with the Device, subjecting Plaintiff to risks which exceeded the benefits of the Device;

(b)    the Device contained misleading warnings emphasizing the efficacy of the Device while downplaying the risks associated with it, thereby making use of the Device more dangerous than the ordinary consumer would expect;

(c)    the Device contained insufficient and/or incorrect warnings to alert consumers, including Plaintiff, through its prescribing physicians regarding the risk, scope, propensity, frequency, duration and severity of the adverse events associated with the Device;

(d)    the Device did not disclose that it was inadequately tested;

(e)    the Device failed to convey adequate post-marketing warnings regarding the risk, severity, propensity, frequency, scope and/or duration of the dangers posed by the Device; and

(f)    the Device failed to contain instructions sufficient to alert consumers to the dangers it posed and to give them the information necessary to avoid or mitigate those dangers.

158.   Plaintiff used the Device for its intended purpose, i.e., hip replacement.

159.   Plaintiff could not have discovered any defect in the Device through the exercise of due care.

160.   Defendant, as designer, manufacturer, marketer and distributor of medical devices is held to the level of knowledge of an expert in the field.

161.   Plaintiff and her implanting physician did not have substantially the same knowledge about the Device as Defendant who was the designer, manufacturer, or distributor of the Device.

162.   Defendant reasonably should have known if its Device was unsuited for active individuals such as Plaintiff.

163.   As a direct and proximate result of Defendant's failure to adequately communicate a warning and/or failure to provide an adequate warning and other wrongful conduct as set forth herein, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages, as set forth herein.

164.   As a direct result of Defendant's failure to warn and/or inadequate warning and Defendant's other tortious conduct, Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

165.   As a direct and proximate result of Defendant's failure to warn and/or inadequate warning and Defendant's other tortious conduct, as set forth herein,

COMPLAINT FOR DAMAGES

Plaintiffs suffered and will continue to suffer injuries, damages and losses, and are entitled to compensatory damages in an amount to be determined by the trier of fact.

## COUNT 4 - NEGLIGENT MISREPRESENTATION

166.   Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs 1-129 of this Complaint.

167.   Defendant had a duty to truthfully represent to the public, the medical community, to Plaintiff, Plaintiff's healthcare providers, and the FDA that the Profemur® Total Hip System had not been properly tested, or found to be safe and effective for its intended use.

168.   Defendant knew or should have known that its representations that the Device was safe and effective were false and the representations regarding the safety and performance of the Profemur® Total Hip System were in fact, false.

169.   Defendant failed to exercise ordinary care in determining the truth or falsity of its representations, and by misrepresenting the safety and performance of the Profemur® Total Hip System.

170.   Defendant breached its duty to present truthful representations by knowingly, or by want of ordinary care, misrepresenting the safety and performance of the Profemur® Total Hip System.

171.   Defendant made representation that it knew or should have known to be untrue with the intent that Plaintiff, Plaintiff's implanting physician, the medical community, and the public would rely on those representations and utilize

Defendant's product in hip replacement surgeries, including Plaintiff's implant surgeries.

172.   Plaintiff and/or Plaintiff's implanting physician reasonably and justifiably relied upon the material representations made by Defendant regarding the safety, efficacy, performance, and suitability of its Device.

173.   Neither Plaintiff nor Plaintiff's implanting physician knew of the falsity of Defendant's representations, nor could they have discovered the truth through reasonable due diligence or care.

174.   Had Defendant accurately and truthfully represented to the medical community, Plaintiff's implanting surgeon, Plaintiff, and the public the material facts that it knew regarding the risks of the Wright Medical Profemur® CoCr Modular Neck coupled with the Wright Medical Profemur® titanium modular stem as part of the Wright Medical Profemur® Total Hip System, Plaintiff and/or Plaintiff's surgeon would not have utilized Defendant's Wright Medical Profemur® Total Hip System.

175.   As a direct, legal, proximate and producing result of Defendant's concealment of material facts, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## COUNT 5 – FRAUD BY CONCEALMENT

176.   Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs 1-129 of this Complaint.

177.   Defendant had a duty to accurately and truthfully represent to the medical community, Plaintiff, and the public that Wright Medical Profemur® CoCr Modular Neck, and the Wright Medical Profemur® Total Hip System, had not been adequately tested and found to be safe and effective for the treatment of patients requiring a hip replacement.  Instead, the Defendant knew, but deliberately failed to communicate this to Plaintiff or Plaintiff's surgeon.

178.   Defendant had a duty to inform, but fraudulently concealed from the medical community, Plaintiff's implanting orthopedic surgeon, Plaintiff, and the public that the Wright Medical Profemur® CoCr Modular Neck coupled with the Wright Medical Profemur® titanium modular stem in the Wright Medical Profemur® Total Hip System had an unreasonable and dangerous risk of corroding and causing bodily injury.

179.   Defendant knew of the risk of corrosion and resulting bodily injury present in the device implanted in Plaintiff and neither Plaintiff nor Plaintiff's surgeon had this information, nor could they have discovered this information through reasonable diligence or care.

COMPLAINT FOR DAMAGES

180.   Defendant had a duty to communicate the increased risk and known failures associated with the device implanted in Plaintiff to Plaintiff Olver and Plaintiff Olver's surgeon.

181.   Plaintiff and Plaintiff's surgeon justifiably relied upon Defendant to communicate known risks and failures in both the decision to implant the device and follow up treatment after index surgery.

182.   Had Defendant accurately and truthfully represented to the medical community, Plaintiff's implanting surgeon, Plaintiff Olver, and the public the material facts that it knew regarding the risks of the Wright Medical Profemur® CoCr Modular Neck coupled with the Wright Medical Profemur® titanium modular stem as part of the Wright Medical Profemur® Total Hip System, Plaintiff and/or Plaintiff's surgeon would not have utilized Defendant's Wright Medical Profemur® Total Hip System.

183.   Had Defendant not fraudulently concealed the increased risk of fretting corrosion, effects of fretting corrosion, and the known failures of the device from Plaintiff or Plaintiff's implanting surgeon, Plaintiff's injuries would have been avoided or limited.

184.   As a direct and proximate result of Defendant's fraudulent concealment, Plaintiff  has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or

economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## **COUNT 6 –FRAUDULENT MISREPRESENTATION**

185. Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs 1-129 of this Complaint.

186. Defendant made false representations of material fact to Plaintiff and/or Plaintiff's surgeon as to the safety and efficacy of the Wright Medical Profemur® CoCr Modular Neck coupled with the Wright Medical Profemur® titanium modular neck in the Wright Medical Profemur® Total Hip System. Instead of disclosing the heightened risks of corrosion, failure, and permanent injury, Wright represented:

      a)      that there was no indication of an increased risk of adverse events due to fretting and corrosion at the neck-stem taper junction;

      b)      that lab testing guaranteed structural reliability and the absence of significant micromovement and of fretting corrosion;

      c)      that product complaint data did not indicate an increased risk of galvanic corrosion for Wright Medical Profemur® CoCr Modular Necks when coupled with Wright Medical Profemur® titanium hip stems;

      d)      that, "[u]tilized in both primary and revision applications, the current [Profemur® modular] neck design has been successfully

employed to improve surgical outcomes with no reported failures";

e)     that CoCr modular necks would result in less fretting than occurred with titanium modular necks; and

f)     that the Wright Medical Profemur® Total Hip System, including its component parts, were safe and effective, and were safer and more effective than other treatments for hip replacements.

187.    Defendant knew that the representations alleged in paragraph 186 were false, yet Defendant willfully, wantonly, and recklessly disregarded the inaccuracies in its representations.

188.    Defendant made these false representations with the intent of defrauding and deceiving the medical community (including Plaintiff's implanting surgeon), Plaintiff, and the public, and to induce the medical community, Plaintiff's implanting surgeon, Plaintiff and the public to utilize its Wright Medical Profemur® CoCr Modular Neck coupled with the Wright Medical Profemur® titanium modular stem as part of the Profemur® Total Hip System. Doing so constituted a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff and the public.

189.    Plaintiff and her implanting orthopedic surgeon justifiably relied upon Wright's false representations of material fact in deciding to utilize the Wright

COMPLAINT FOR DAMAGES

Medical Profemur® Hip System, including the CoCr modular neck and titanium modular stem.

190. Had Plaintiff or Plaintiff's surgeon known the true facts about the dangers and health risks of the Wright Medical Profemur® CoCr Modular Neck coupled with the Wright Medical Profemur® titanium modular stem as components of the Wright Medical Profemur® Total Hip System, they would not have utilized the product.

191. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## COUNT 7 – PUNITIVE DAMAGES

192. Plaintiff incorporates by reference as if fully set forth herein the facts alleged in paragraphs 1-129 of this Complaint.

193. Defendant knew or should have known, in light of the surrounding circumstances that its conduct would naturally and probably result in injury or damage and continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred. Accordingly, Plaintiff is entitled to an award of punitive damages.

COMPLAINT FOR DAMAGES

## **<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.      For general damages for personal injuries to Plaintiff, according to proof;

2.      For all past, current, and future medical and incidental expenses, according to proof;

3.      For all past, current and future loss of wages, according to proof;

4.      For punitive and/or exemplary damages in an amount sufficient to punish Defendant and deter similar conduct in the future, according to proof;

5.      For prejudgment interest, as provided by law;

6.      For reasonable attorneys' fees;

7.      For costs of litigation; and

For such other and further relief as this Court may deem just and proper.

DATED:  July 20, 2020                          BOUCHER LLP


By:      /s/ Raymond P. Boucher
         RAYMOND P. BOUCHER (CBA 115364)
         BOUCHER, LLP
         21600 Oxnard Street, Suite 600
         Woodland Hills, CA  91367
         Phone: (818) 340-5400
         Facsimile: (818) 340-5401
         Email: ray@boucher.la

         *Attorneys for Plaintiff Ann L. Olver*

# **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands that the present matter be set for a jury trial.

DATED: July 20, 2020          Respectfully submitted,

BOUCHER LLP

By: ____/s/ Raymond P. Boucher____
RAYMOND P. BOUCHER (CBA 115364)
BOUCHER, LLP
21600 Oxnard Street, Suite 600
Woodland Hills, CA 91367
Phone: (818) 340-5400
Facsimile: (818) 340-5401
Email: ray@boucher.la

*Attorneys for Plaintiff Ann L. Olver*

COMPLAINT FOR DAMAGES